15-3671, Catherine Petzel v. Redflex Traffic Systems, et al., Argument Not to Exceed, 15 minutes per side. Mr. Camillus, you may proceed for the appellant. Good morning. Thank you. Good morning, your honors. May it please the court. My name is John Camillus, appearing on behalf of the appellant, Catherine Petzel. I've asked to Your honors, this is a pretext case. At the district court, Redflex initially moved her summary judgment, arguing primarily that the plaintiff could not meet her prima facie case. But in their reply brief, they conceded the plaintiff met her prima facie case, the district court found that she met her prima facie case, and there's no argument of appeal that she has not met her prima facie case. As a result, we're left with Redflex's non-discriminatory rationale that they've offered for Ms. Petzel's termination, that is, that she failed to meet the sales goals of her performance improvement plan, and whether the summary judgment record contains any evidence to establish that that profit rationale is contextual. Against that backdrop, the case can really be viewed under one of two lenses. The first is very clean, quite frankly. Ms. Petzel made her prima facie case. Redflex has offered its non-discriminatory rationale. The burden shifts, of course, to Ms. Petzel to demonstrate the pretext. And the case was clear that one way in which she can do that is by showing that there is a colleague, generally outside of her protected class, who committed the same infraction, but was not disciplined in the same manner. Here, a fellow salesperson, Darren Collick, and I think it was Colback, an American male, was put on the very same performance improvement plan that Ms. Petzel was, failed to meet the requirements of that performance improvement plan, just as Ms. Petzel did, and was not disciplined in it. Was he similarly situated? He was, Your Honor. During the performance improvement plan, did he secure two contracts, or at least start securing them two contracts? So, the phrasing of that is what makes me hesitate, because I've never been able to be clear on what Redflex means when it talks about executing contracts, securing contracts, contracts that are entered into but not approved. It does appear that there was at least one contract in Nogales, and there may have been another that was at some point in the approval process, but never executed. And Redflex's position in this litigation has been that a contract that is not executed does not count. Well, he also had this student guardianship responsibility. Yes, sir. And also, didn't he also have two out of the three states he covered taken away from him for reasons unrelated to him? There was, there is evidence that he had some of his territory taken away, but there's also evidence that he had additional territory granted to him. There's also evidence that the state was granted to him. I think certain parts of New England, Connecticut, and maybe bordering states in Connecticut. Were either of those two contracts he got in the second quarter, were either of those in the area that was later given to him? I think that one of the contracts they refer to in those two is the New Brighton contract, which is in Connecticut, as I understand, Your Honor. But that distinction is not actually a distinction because the same is true for Ms. Petzel. She was in a limited territory, and like what Mr. Kolak claims, or what Redflex claims about Mr. Kolak's territory in Arizona drying up, the same is true for Ohio. There's undercutted testimony by Ms. Petzel that Ohio was a politically difficult climate that was moving lots of their cities and municipalities Did she get any completed contracts during either the first quarter of 2012 or the second quarter? Again, the summary judgment record is unclear on that. So she has this one in Texas. There's this one in Texas. Was that city below the size that Redflex typically sold to? It was, but Redflex approved the sale. In fact, she was directed to go there to make the sale. Redflex makes exceptions because what's really critical to Redflex is the opportunity for revenue from the red light cameras, and while Montgomery, Texas is a small town, it is a place that apparently, as I understand it, has lots of cars going through there. It's in between Big City A and Big City B or College Town. So even though it's a small town, there's a fairly decent opportunity for revenue from Redflex. So in Does COFLEX arguably have two contracts during the performance improvement period while she at best has one? I suppose that's arguably the case, but it's only arguable because Redflex has said that the contracts need to be executed, and because Redflex has admitted in its litigation that for purposes of what the performance improvement plan required, COFLEX's number of contracts was zero. Well, in this case, it wasn't one of the contracts he presented taken away because Redflex, for whatever reason, made the decision they didn't want to go to Arizona, and Redflex canceled the contract. That's Redflex's position about that, but as I understand Redflex's position, that makes it an unexecuted contract, which makes it, therefore, a contract that does not satisfy a requirement of the performance improvement plan, and Redflex's argument about COFLEX's performance under the performance improvement plan has never really been that COFLEX did what he was supposed to, and there were some technicalities. It was COFLEX has a student guardian role, and because of the difference between whether they were similarly situated. Well, may I, I want to, I hate to follow up a question with a question, but for purposes of similarly situated, are we talking about the fourth prong of the prima facie case, or are we talking about the third stage of McDonnell-Douglas, where she shows that she was treated differently from a colleague who committed the same infraction? Well, we're talking about whether they're similarly situated under the Bercovitch or Bercovitch. Are they similarly situated in all material respects? They are, Your Honor. Well, coming into it, how many contracts did she produce over the two or three years before the performance improvement plan? So, there were three contracts that she received. How many did he produce? I don't know that number off the top of my head, Your Honor. Is it somewhere around 11? I believe they claimed something like that, yes, but I will tell you that in order to be material for the similarly situated analysis, it has to be part of the basis on which the decision-making process happened, and a reasonable jury could reject the distinction that you're offering about their performance history prior to the performance improvement plan, because Redflex never offered it as it went along. In other words, when a new sales policy was put in place, nobody said to Collap, for instance, because you have a strong sales history, we're going to be lenient with you about this sales policy, and you don't have to actually make these, you know, the allotted number of sales. Well, had they been giving your client warnings all along? I don't believe that there were warnings all along, Your Honor. Had they been giving COFLAC similar warnings? I'm not aware of COFLAC receiving any warnings. The only warning I'm aware of is PESA receiving was an improper warning that took place during the period of the new sales policy when they put her on a performance improvement plan in August of 2011. That was during the first fiscal quarter of the new sales policy. It was before she was even eligible to be put on a performance improvement plan. Yeah, but they never enforced that, right? They didn't. They gave her an additional 60 or 90 days. They did, and they claim to have done that out of the goodness of their heart, but the record reflects that the sale in Texas meant that she satisfied her performance improvement plan. So it wasn't a matter of Redflex's generosity that they gave her the additional… Wasn't she required to produce one contract every quarter? She was. Even if you give her that in Texas, what's the second contract that she satisfied in the first two quarters? Well, there wouldn't have been one, but all that would have meant is that she should have been put on a performance improvement plan for the third quarter. In other words, she has a Texas contract in quarter one. She is now right where she's supposed to be. She shouldn't be on a performance improvement plan in quarter two. She should be just on schedule. When she fails then to make a sale during quarter two, they should put her on a quarter three performance improvement plan. That requires her to make one sale in quarter three and another sale in quarter three to make up for the sale that she missed in quarter two. So at the end of quarter two, she would have been behind the sales goals, but only by one sale for one quarter, which would have then led to a performance improvement plan as opposed to leading determination. That's what the policy requires. The policy says one sale per quarter. If you miss a quarter, we put you on a PIP. In the following quarter, you need to make two sales, one for that quarter, one for the prior missed quarter. But isn't the overall issue trying to determine what the employer's motivation had been and whether it was discriminatory? Absolutely, that is the ultimate issue. So the performance improvement plan may be part of that, but isn't the overall issue as to whether their lack of sales justification was the motivator or whether her Australian background or her sex was the motivator? There's no question that's the ultimate question here, Your Honor. But in the context of the McDonald's partnership analysis and summary judgment record... So in terms of determining the pretext, can we look at her past sales and his past sales irrespective of the performance improvement plan? No. Because Red Flex has stated, because Ms. Finley testified that the only reason she was terminated was for failing to meet the requirements of her performance improvement plan. And because Red Flex's communications with Ms. Petzl all along never indicated that she was being held at any other standard than any other salesperson because of her past sales performance. Well, I think part of your argument was that it was shifting rationales because they referred to her poor past performance and that that was somehow a shifting rationale from the... That is, that is exactly right. And not only have it both ways, you're now saying that they always said that the performance improvement plan was the only reason for the firing. And in your briefing, you suggested that they also gave a separate reason that her sales were lousy all along. Yes, Your Honor. So let me be clear about that. I believe that those are shifting rationales, and that is part of why there could be a finding of pretext here. But in the context of your question, the more favorable position for Red Flex to take is that, as Ms. Finley testified, she was terminated only for failing to meet a PIP. And because she was... Because Red Flex... Because that's your question. Your question, as I understood it, was can we look at the fact that she was terminated just for failing to meet a PIP, or can we look at the rest of the sales history? Okay? So in that context, we look at Ms. Finley's testimony that was only for failure to meet a PIP. And we look at Red Flex's history of talking to Catherine Petzl in this context and never saying that she was being held at any other standard than anybody else because of her background. And on the summary judgment record, with all inferences being made for the non-movement, we have to say that... And the district court found that the reason was failure to meet a PIP. I would also say that beyond the similarly situated scenario, there are various other rationales for pretext. There's the fact that there were these shifting rationales. There is the... There's the... What's the most important one? What do you think is the most important one that you would argue creates a disputed material fact? So in the context of Mr. Kolak specifically, it's Kolak's testimony that he was told that he was being kept on because he met the requirements of the PIP. That's what Rosenberg told him, which is completely contrary to the position that Red Flex takes in this litigation. But if we're looking out... And contrary to the e-mails. Contrary to the e-mails as well. Yes. And all of that e-mail history is telling Darren Kolak, you're on this PIP, you're going to be terminated if you don't meet it. All that time, they know about the student guardian issue, and they're still holding him to this until the very last minute. But if we're looking outside of the... You know, there's one way to prove pretext is by showing that you're treated differently than a colleague who committed the same infraction. But there are various other ways that apply here as well. I've listened to the entire brief, and there's a number of them, but to answer your Honor's question, I think the most important is the failure to follow policies. As much case law that says... Do you know what happened with Kolak's position since they were taken away to the Lutheran states? Did they hire someone else to do his job, or was that job effectively eliminated? I don't know the answer to that, Your Honor. Does it matter to your case? Because if his job went away, is it a transfer, or did he merely retain another area of work in which he was already engaged for this employment? I don't think it matters, because it still is a transfer, because of the way that Red Flux's policy defines transfer. It's a new set of job responsibilities, a new reporting structure, which makes it a transfer. Well, if it helped you understand how that works, if what has happened is his job has gone away, and that he had taken the work he was doing and created a position for a new product, does that work for you? Well, so it still does work for us, and I'll say a couple things. I don't believe that the record contains any evidence about whether the job simply went away, and nobody was assigned to his former territory, or a new person was assigned. I don't think that's contained in the summary judgment record. But I will say that I don't think it's relevant, ultimately, to the analysis here, because of the position that Red Flux took with Kolak leading up to the end of calendar 2011, Q2 fiscal year 2012. In other words, if Kolak was going to be retained because his area had dried up, and because he had this important experience with Student Guardian, and they needed him to head up that project, Red Flux would have said that all along. They would have said, in mid-2011, when they instituted the new policy, this policy does not apply to Darren, because his area is drying up, and because he's shifting to a Guardian focus. When Darren was put – when the first quarter of fiscal year 2012 ran out, they wouldn't have put Darren on a pit. They would have said, Darren, you didn't make a sale, but because of your role with Guardian and because of your area drying up, we have no reason to put you on a pit. Or at the conclusion of – it would have happened sometime before the very last minute. And based on that – So they could do that, Your Honor, and there's a fact question to that. There's no question that a jury here could believe that. That if Red Flux honestly thought, we need him for Guardian, and that's why we're going to keep him on, that that's a non-discriminatory rationale. There's nothing discriminatory about that, and we will lose the case at trial. But because of the history leading up to it, and because of the case law on what we need to show at the various stages of McDonnell Douglas, it becomes a jury question. Because a reasonable jury could say, look, they – this Guardian thing popped up at the very last second. If that's really what was going on internally at Red Flux and really what they cared about, we would have heard something about it. The trial of Kolak is a declaration where he says specifically that on that transfer that they told him that it was because of the Guardianship. That's true, but that's inconsistent with what he said in his deposition testimony. I asked him explicitly in his – Well, in their records show that they – in their internal records, don't they also show that he was transferred to the Guardianship or he wasn't transferred because of the Guardianship war? Your Honor, there's no question that there is evidence in the record that he was transferred to Guardianship at the conclusion of the PIF that he failed to meet. But my point is only that there is also contrary evidence in the record, which is why it's a jury question. His testimony explicitly says Rosenberg told me that I was being retained because I met my sales goals. That's contrary evidence, and that's where the trial of Trafford is all. And Judge Scranton – You have four minutes for public. You can use it now or you can – I'll use just 30 seconds of it if I might, Your Honor, because I don't think I've got to complete my answer to you, Judge Scranton, about the most important other basis or pretext once we move outside of this question of was there a colleague who committed the same infraction who was not disciplined in the same way. And my answer to that is the most – the biggest one is Redflex's failure to follow his own internal policies. They did it when they placed Petzl on a PIF too early. They did it when they placed Petzl on her second PIF even though she had made the Texas sale, and they did it when they transferred Kollab to Guardian despite the fact that he had recently been on corrective action. There's much case law that says failure to follow internal policies can show evidence of pretext that a jury need not accept an employer's justification for why they veered from their internal policy. And though there's many other reasons to establish pretext, that's our strongest place once we look outside of the mere fact that somebody who committed the same infraction was not disciplined in the same way. And I'll reserve the remainder of my time. Thank you. You're welcome. Good morning. Good morning, Your Honors. May it please the Court, I'm Vincent Tricini on behalf of Redflex Traffic Systems. It's our position, Your Honors, that Judge Economist properly examine this pretext argument presented by Ms. Petzl on the Summer Judgment Briefing, carefully examined all the evidence and looked at whether or not Mr. Kollab was comparably treated to Ms. Petzl and decided that there was not sufficient evidence from which a jury could determine that there was an issue of that trial. And he based that on a number of reasons. First of all, Mr. Kollab was placed on the same performance improvement plan as Ms. Petzl along with a third employee, also a male, non-Australian, by the name of Charlie Buckles. All three of them got the same performance improvement plan on or about October 1, 2011. All three of them told if you don't execute three contracts by the end of this calendar year, which would have been the first two quarters of fiscal year 2012, your employment will determine it. Three or two? It was two executed contracts, Your Honor. Charlie Buckles met that. He executed two contracts by the end of that year, calendar year, and fiscal year or two. Ms. Petzl did not, and neither did Mr. Kollab. He did not execute two contracts by the end of the year. Ms. Petzl didn't execute a single contract in all of calendar year 2011. Mr. Kollab did have an executed contract in February of 2011. He had two pending contracts in Arizona, which you think is a better judgment. You referred to earlier. They fell through in the fall of 2011. Frankly, they weren't counted in terms of meeting executed contracts. Was he not similarly situated? I think he is similarly situated, but he was treated – he was not treated in a discriminatory – or she was not treated in a discriminatory manner based on the reasons that they retained Kollab. They got to the end of the year. There were mitigating circumstances for retaining Kollab's employment. First of all – So if that's the case, your opposing counsel would ask why that was not provided in relation to him as opposed to the emails that said, here's the PIP. You've got to satisfy it. If you don't, you can turn it down. Yeah. It was not provided to whom? To Kollab. Why wasn't Kollab told? Why isn't there a paper trail that says, Mr. Kollab, you do have to do the contracts. There was one. But you're in Guardian, and so we'll send you to Guardian. There was one in October. I think it was right around October 6th when Ms. Petzl received her performance program. He was told he needed two executed contracts. Why? He was also working on student Guardian at that time. And Mr. Kollab was a go-getter. He went out and he started this new product line. My question to you is – Yes? What is the documentary evidence that while Mr. Kollab was being told he had to comply with the PIP and had to have the contracts just like Plankton did, where is the information in the record that says, but you have to buy because you're on Guardian or we're thinking of sending you to Guardian if you don't satisfy the PIP? Oh, he was not on the impression that he had any kind of buy at all, Your Honor. He was on the impression he was going to be terminated by the end of the year just like Mr. Buckles and Ms. Petzl under this plan if he didn't execute two contracts. They came at the end of the year, and it's established in the – there's a memo establishing why they retained Mr. Kollab, which I think is Exhibit C1 to the reply group in this case, where they describe the mitigating reasons for retaining Mr. Kollab, which the district court also noted. He was involved in the student guardian program. His territory and – Does that not create a disputed fact as to why Red Flag says, we didn't fire him. We treated him differently, we didn't fire him, but here's why. It was a business decision. And Petzl says, no, it wasn't. It was because I'm a woman and an Australian. Why is that not a jury question? Well, because there's no proof that he was treated differently because he's a male and an American. There has to be sufficient evidence from a jury to decide those differing reasons were because of that employee's status in a protected class. That's what's absent in this case. The judge looked at the evidence why Kollab was treated differently, why he was not terminated and determined that there was no evidence that that reason he was terminated was treated differently was because of his gender or his national origin. The reason was, is the company needed somebody to run the student guardian program. He was the one that came up with the pilot program to do that. He had been spending his time trying to make sales for student guardian throughout the time that he was also trying to execute contracts. And he had a much more successful sales record, frankly, than Mr. Petzl. So my concern is the standard that we're looking at. You're on summary judgment. You've got to see the record in the light that's favorable to the evidence in the light that's favorable to the party that's the non-movement. Yes. I'm struggling. Give me your best argument as to why on summary judgment there's not a dispute of material fact as to that reason. There's no question you offered a legitimate law for that. But she claims it's pretext. Why are you not calling it a dispute at the pretext level that would suggest that the final fact has to make this decision, not a summary judgment motion? Well, I would say, Your Honor, that just because two people are treated differently doesn't mean it was discrimination. But if there's an issue of fact as to discrimination, as the district court found, there were legitimate non-discriminatory reasons why Mr. Kulak was treated differently that had nothing to do with his gender or his national origin. It had to do with his performance at the company. Why doesn't Ezback's statements to Petzl create that dispute of material fact? Well, Judge Economist looked at that as well. And what Ezback supposedly told to Petzl in a telephone conversation is that she was targeted or that Mr. Rosenberg didn't like her because she was a woman. Well, first of all, Ezback was not the post in this case. He submitted an affidavit stating that he never said that. No. Did his affidavit say that? Yes. I think his affidavit said, I did not encourage her to get an attorney. I told her the decision was up to her. I told her to encourage her to file a press lawsuit and retain an attorney. In Mitzi's telephone conversation with Petzl, during which she indicated she was considering a discrimination suit due to her determination, he does not deny what she says in her testimony that he told me he thought that they were discriminating against her. I stand corrected because I thought it was in his affidavit, Your Honor. I think it's actually paragraph 13 of his declaration. During the phone call, Petzl solicited my feedback on whether she should go forward with the lawsuit. I told Petzl that the decision was up to her but did not encourage her to file the present lawsuit or retain an attorney. So there's no denial that he suggested that he thought that she was targeted for an improper reason? Well... I mean, do you see that in that language? That's the language that addresses this. Why is that statement that she placed in the evidence that this is what Hertzbach told me, why is that not an admission in its entirety? Well, first of all... It's visible evidence. Well, I believe it's hearsay first of all, Your Honor, because if he's saying what he thought, Rosenberg thought, and he's communicating this to Petzl, who's then testifying about it, I'm not sure where we get along the line that that's not hearsay. If he had said it to somebody else and that was told to Petzl... It's not hearsay, it's just a lack of personal knowledge issue. How can he know what the motivation of somebody else was? Right, that as well, Your Honor, and that's what the district court looked at. How could he possibly know what Rosenberg had in his mind when there's absolutely no other documents that carry evidence of what Rosenberg had in his mind or the reasons for making a comment? Is there any evidence that Rosenberg said something to Hertzbach about what his motivation was? No, there's no evidence at all. In fact, Rosenberg was not opposed to the case, neither was Hertzbach. So Hertzbach doesn't deny it. I'm struggling with what seems to me admissible as an admission against interest. Your opposing counsel argues that the court below found that it was not direct evidence. Everybody agrees on that. It's not direct evidence. But the question is whether it's evidence of pretext and whether the statements made by someone who was her supervisor in the company do not in fact show a question of fact by denying an admission of interest against interest by her own employer. Yeah, well, first of all, it wasn't denied an admission of interest by Hertzbach, who was actually the person who recommended and approved her employment termination. So it's a little odd that Mr. Hertzbach would make this comment to Petzl and frankly would think it's very self-serving testimony. But Petzl, again, not established by any other evidence in the record that Hertzbach said that Rosenberg fought this. And Judge Economist did examine that. As direct evidence? Yeah, as direct evidence. He said it was not direct evidence, but he still considered it, as far as I can tell from his opinion, as to the overall determination of whether a prior fact could look at that. And he ultimately determined that, look, Hertzbach can't determine what's in Rosenberg's head. There's no other evidence in the case that Rosenberg said this. Petzl testifies she never had any gender-related comments of any kind from Rosenberg. There's nothing to tie the subjective belief, if that's what it was, of Hertzbach to any evidence in the case from which a prior fact could finally play the plaintiff's favor in terms of establishing a gender issue with that and then ultimately proving intentional gender discrimination. I hope that's helpful. Yeah. OK. And if you notice from the district court's opinion, he was also influenced by the fact that there were four other male American employees, sales employees, who were placed on PIPSC and ended up being terminated from employment. So now we have a total of six people placed on performance improvement plans, and five of them end up leaving the company, and one of them happens to be Petzl. One of those four additional employees was terminated. The other three resigned because they were not going to meet their performance improvement plan. So if the company, if the ultimate issue is whether or not the company was treating male employees better than female employees, the court very carefully looked at that and said there's just not any evidence of that. If their intent is to retain male sales employees over females, they weren't doing a very good job of it, for example, because there were multiple other male American employees placed on performance improvement plans who left the company. Help me understand why the transfer of COLAG was not in violation of your transfer policy. Well, yeah, Ms. Petzl tried to argue that in their brief, and as the judge noted in the district court's opinion, there's a very large exception to that, which established that if the business needs of the company require, and the transfer is approved, then we will accept a transfer of employees under a disciplinary action. But your opposing counsel responds that that's an exception not to transfer of someone who has, is a recipient of a corrective action. It applies only to the phrase that if the salesman has transferred once, he or she is not eligible to transfer again until he or she has been in a position for one year. A transfer may be approved sooner if it meets the needs of the business and is approved by HR and or the departmental executive. Continuing, corrective action policies still apply. So it seems very much that the transfer issue has two components, and that the exception has to do with the second component, being transferred more than once in a year. Well, I disagree with that interpretation of the policy. I think that exception applies to any type of transfer of the company. You know, at any time, as stated in the policy, a transfer may be approved sooner if it meets the needs of the business and is approved by HR and or the departmental executive. It may be approved sooner than what? Sooner than the one year? Correct. So it defines the one year period, and I guess I'm struggling with it. It begins with the corrective action policies still apply. So why would somebody in violation of a PIP not be excluded from the ability to transfer under this policy? Why is it a violation of the policy? Why isn't it a violation of the policy? Yeah, why is it not a violation of this policy to transfer someone who is under corrective action? Well, frankly, the PIP ended at the end of the year, so they needed to decide what to do with COLEC, and his position was eliminated. He did not stay in that position. They needed to make a decision. Do we terminate COLEC for not meeting the terms of his PIP, or do we look at his performance record and the fact that we need someone performing the student guardian job and retain him? And they decided to retain him, and that does not violate their transfer policy because, again, the PIP had ended. They needed to decide what to do with his employment, and they had the right to approve his transfer sooner because it met the needs of the business, and I would disagree that that section only applies to the part that the plaintiff's counsel, the felon's counsel references. And you would say that you can ignore the policy provision that says corrective action policies still apply? Well, the way I would interpret that is if someone had some type of corrective action that they needed to improve, for example, their attendance, and they were transferred to another position, they still needed to probably improve their attendance in their new position. Isn't the PIP a corrective action policy? Yes, I would agree that it is a corrective action policy. It actually ended at the end of the year because along with his employment position, which ended, he went to a new job with the company. Did somebody else take over his position? Not that I'm aware of, but there are other people. I'm here. Okay, sure. Anyway, for all those reasons, Your Honor, we respectfully submit that the district court carefully looked at the pretext argument. By the way, there was some briefing in this case that we misstated the Berger improvement, and I would disagree with that substantially. And the plaintiff's, the felon's counsel also stated that we so-called fabricated a quote to the Manzo v. Diamond-Chamron case. I want to make sure that I correct that. The citation that we made in our brief was to the Warfield v. Lebanon correctional case 181 F. 3rd, 723, 730, in which the court stated, Plaintiff must do more than simply impugn the legitimacy of the asserted justification for a termination. In addition, the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation, citing an answer decision. So ultimately, the Berger proof is on the plaintiff at all times to induce, through summary judgment briefing, sufficient evidence from which to try our fact upon the plaintiff's statement. As noted by the district court, despite these slight distinctions between the employees, Petzo was treated favorably. Any distinctions in the reason that she was terminated, there was not sufficient evidence to establish it was because of her gender or because of her national origin. For those reasons, we respectfully request that the court to affirm the district court's decision. Thank you. Thank you, Your Honor. We've got three and a half minutes left. Thank you, Your Honor. I have four points I'd like to try to make in my limited time, but of course I'm happy to take any questions. The first is that my point is concession, that Petzo and Kovach were similarly situated in the analysis, similarly situated employees, standing for action on fire, The second is, I'm not sure he's talking about at the time of termination. I think he's talking about originally they were similarly situated. But at the time of the termination, the performance was much different. I didn't quite agree that the commission was saying that you did that. Fair enough. We may have had different readings of that. But nothing changed about their similar situatedness between when the PIP began and when the policy began. And when the termination happened, Kovach was already involved in state bargaining. The second point I want to make, Judge French, you brought up the SBAC affidavit. As an advocate, it's always a difficult question when somebody says, what's your best argument, what's your best fact, when I think there are a number of them. The SBAC statement to Petzo is also a very important, separate basis for establishing pretext. It absolutely is not hearsay. And beyond that, why is it speculation? It's not within his personal knowledge. I don't think it's invisible. I think somebody else might have thought that. That's not within personal knowledge. Well, Your Honor, there hasn't been testimony one way or the other about how he has that personal knowledge. Don't we know that Ed Spock recommended the termination? Well, yes. Don't we also know that Ed Spock wasn't responsible for the final decision to fire him? Well, Red Flesh lists him as one of the decision-makers. So what if it's somebody who isn't plausible, that somebody would say, I discriminate against you by recommending your termination? No, and I don't believe SBAC would say that. But he was within the decision-making group. And he had the evidence of a statement by the decider that Ed Spock heard about what the motivation had been. No, there's nothing in the record about that. So you have to rebut their non-discriminatory reasoning. You have to establish a pretext. Of course. You say, well, there's no evidence in the record. There's no evidence this way or that way. So have you sustained a burden of establishing a pretext? We absolutely have. We have in a myriad of different ways. But in terms of this specific question and this specific way of establishing it, Ed Spock was part of the decision-making team. It's not a great leap to assume that he had conversation with Rosenblatt about this decision. It's not a great leap to assume. I mean, why don't we have deposition? Why don't we know this? And why don't you present this documentary evidence to rebut their non-discriminatory reasoning, which is your burden? I'm not suggesting that there is documentary evidence. Well, there isn't. I know. That's the problem I have with your position. OK. My position is that Petzl's statement about her conversation with Ed Spock is not hearsay, which the district's speculation is not admissible evidence. OK. It's not within his personal knowledge. That's the number one criteria of admission. It's fair enough. It's your personal knowledge of this. No, I don't. I'm speculating. I just don't allow speculative opinion testimony to come in from non-experts. Of course. I have no disagreement with that. My only position would be that because Ed Spock was in the decision-making team, his view on the basis for the decision-making team. It's allowed to speculate and conjecture, yes. And that's admissible. That is not my position. My position is that because he was a part of the decision-making team, his personal beliefs about the basis for her termination is not speculation. It is based on his personal knowledge. He was Petzl's supervisor. Red Flex identifies him as one of the decision-makers. And he was expressing to Petzl his view. I don't know if you establish the foundation of all that. But here you have it. Your Honor, I believe that on summary judgment, the question is whether it's clear that it would be innocent, whether a reasonable trier of fact could rule in your favor on the factual dispute. And if a reasonable trier of fact is only allowed to speculate or guess, we don't allow it. Well, of course. I don't disagree with that at all. I wasn't talking about the ultimate summary judgment standard. I was talking about the evidentiary issue of what evidence is properly in the summary judgment record and can properly be considered. It has to be admissible evidence. It has to be admissible evidence. But it doesn't have to be presented in the summary judgment record in an admissible manner. And in order to have it excluded, it has to be clearly in it. What does that mean? Excuse me? What does that mean? It has to be admissible evidence, but it doesn't have to be in admissible form. Yeah. That's what the case law says about what evidence is. I mean, evidence. Don't you have to lay a foundation that evidence is admissible? And isn't part of that showing foundation that the person has personal knowledge of the thing they're giving testimony on? At trial, of course you do. And when you talk about what evidence is properly in the summary judgment record, the question is a little bit flipped. And it's whether it's clear that the testimony lacks foundation. OK? No, I don't think so. OK. All right, well, we obviously didn't have an opportunity to brief it. I'd be happy to write something out that's clear that it's not admissible. No, I think it has to be. I think it's the other way around. OK, well, I can't cite anything off the top of my head because we didn't drill down to this level in the briefing, Your Honor. But my understanding of the case law that is sort of bouncing around in my brain is that the evidence in the summary judgment record that a court can properly consider on summary judgment record need not be presented in an admissible form in the summary judgment record itself. What I think that means is that it doesn't need to be clearly shown in the summary judgment record as admissible. Rather, the party saying, hey, this is improper summary judgment record, this is improper summary judgment evidence, has to be able to show that there's no way that it comes in. Again, this is Ed Spock's testimony about why he thought Petzl was fired, and he's one of the decision makers by reflexes on admission. The only last point I would make, if you could indulge me, relates to the last point that Mr. Chersini made. And I think he's improperly reading Reeves versus Sanderson's law. It is true that ultimately the issue before the jury is whether there was an unlawful motivation. But what Reeves said, and what this court has been clear about in lighter Reeves, is that for summary judgment purposes, if there's evidence of pretext, if there's evidence that supports rejecting the profit in the non-discriminatory rationale, that is sufficient to survive summary judgment. And from the rejection of the non-discriminatory rationale, a jury may, need not, but may, infer discrimination. So there doesn't have to be specific, separate evidence that it was motivated by gender discrimination. All we have to do is survive summary judgment and the issue of effect discrimination would show up back regarding pretext. It's not discrimination against Australians. Isn't that a little stretch? Is there any evidence that they don't like Australians? To be perfectly candid with you, there is some evidence, Your Honor, but this is a gender discrimination case. I've never seen a case against Australians. Well, this is an Australian-run company, so there's some particular reasons why the Australian issue matters here, and there is some testimony about common... Well, wouldn't that work against you? Why would an Australian company intentionally discriminate against an Australian name? Well, because it's the North American brands that has great frustration with the Australian parent company. But I'm going to be honest in responding. In total candor, Judge Griffin, this is a gender discrimination. Well, you make a recommendation. You should never use that in an argument. You should never say, to be honest. I agree. I apply some lack of honesty or lack of condor to the candor in the past, right? I don't mean to make that implication, but I will say... Is there a history of discrimination against women in this country? Well, in the sales force? Well, I know that there aren't very many women in the sales force. At one point, she was the only one. Yes. But, I mean, usually we'll have... Even though you have no direct evidence of discrimination, usually we have some of us that can kind of go along with the pretext. And there's something else there. And here I don't see anything as to national origin or sex discrimination. Is there anything else? I'm not sure what you mean by something... Well, you know, there's stray comments or... You know, something. It doesn't really prove it, but it could help support your argument. You know, I'm... Unless you consider the various ways that we think pretext is established, because there's many, I will say this. The question essentially asks for what the courts refer to as pretext plus. And in certain cases... Fair enough. I appreciate your... Do you consider the fact that they fired four males for the same reason they fired your client? Absolutely not. And it's not true that they fired four males. They fired zero males. All four of those males resigned. Well, but under a performance improvement plan, what they do, the writing is on the wall. Well, perhaps. But the milling and writing on the wall... Can we consider the fact that they were put on that and then resigned suddenly? I don't believe you can, Your Honor. I'd go through this in some detail in our briefing. But the answer is that for purposes of those other... those male colleagues, the similar situated analysis that usually is applied at the fourth prong of the prima facie case also applies to whether they're similarly situated in terms of a red-flex treatment. They were not similarly situated for various reasons. All of them resigned. None were fired. Based on the way that Rosenberg treated... Do any of them have sales records as bad as your client coming in to the performance improvement plan? I don't believe that we have any record in the summary judgment... about their sales history. We do have the PIPs that they were on. They were different than the one Petzl was on. Under Erskogovich and his progeny, that makes them not similarly situated. All resigned. None were terminated. And because Rosenberg did... Rosenberg had COLAB on his PIP. He failed to meet it.  It's an inference to assume that... Okay. Thank you, Your Honor. Thank you very much. I appreciate your time.